J -S02015-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

 COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
 PENNSYLVANIA

 v.

 JAMAR STAMPS

 Appellant : No. 1030 EDA 2016

 Appeal from the PCRA Order March 4, 2016
 In the Court of Common Pleas of Philadelphia County Criminal Division at
 No(s): CP-51-CR-0010438-2009,
 CP-51-CR-0010439-2009, CP-51-CR-0010440-2009

BEFORE: BOWES, J., NICHOLS, J., and RANSOM, J.*

MEMORANDUM BY BOWES, J.: FILED JUNE 22, 2018

 Jamar Stamps appeals from the order that dismissed his petition filed

pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.

We affirm.

 The underlying facts of this case are as follows.

 On July 24, 2009, Eric Jones was working as a plumber in
 the Raymond Rosen Manor Homes, a Philadelphia Housing
 Authority development located on the 2000 block of North Judson
 Street. At approximately 1:30 p.m., Mr. Jones went outside to
 look for a part so that he could complete his assignment inside
 one of the houses on that block. When he came outside, he
 noticed a red truck in the middle of the street. Mr. Jones walked
 behind the truck, stepped into the middle of the street with his
 back facing the truck, and asked another Housing Authority
 employee at the corner of Judson and Diamond Streets whether a
 garbage disposal unit was available from the maintenance office.
 Hearing two gunshots very close to him, Mr. Jones turned and saw
 an arm extended outside the passenger window of the red truck.
 The passenger pointed and fired a semi -automatic handgun at

* Retired Senior Judge Assigned to the Superior Court.
J -S02015-18

 Gregory Smith, who was approximately ten to twelve feet away
 from the passenger's right side.

 As the shooter fired an additional five to six times, Mr. Jones
 saw smoke coming out of the gun. Having been shot in the chest
 a couple of times, Mr. Smith spun around and fell to the ground.
 Still, the passenger continued to fire his gun. When the shooting
 stopped, the truck drove the wrong direction on the one-way
 street. Mr. Jones ran down the street to find Housing Authority
 police. When he returned to the scene, Philadelphia police officers
 had already arrived.

 Police Officers Dominic Mathis, Kevin Overton, Kenneth
 Emmett, and Joseph Caruso were on summer beat patrol in this
 high crime area. As they stood on the southeast corner of Judson
 and Norris Streets, they also heard several gunshots coming from
 one block away. Hearing those gunshots, Officers Overton,
 Emmett, and Caruso ran north on Judson Street. As they headed
 in that direction, they saw a bright red Ford pickup truck with
 tinted windows speed past them, going south on Judson Street.
 Looking through the truck's front windshield, Officers Mathis and
 Caruso saw two black men inside the truck and noticed that the
 front passenger was larger than the driver. The passenger
 weighed approximately 200 to 250 pounds. The truck then turned
 right and headed westbound on Norris Street.

 When Officers Overton, Emmett, and Caruso arrived at the
 shooting scene, they encountered a frantic crowd of people who
 were yelling, screaming or running into their homes or onto their
 porches. They found Mr. Smith lying on the sidewalk in front of
 2056 North Judson Street. . .As the other officers tried to
 .

 control the crowd, several people started yelling, "Get the red
 truck. Get the red truck. Get the guys in the red truck." Officer
 Overton placed this information about a red truck over police
 radio. . .After Mr. Smith was taken to the hospital, Officers
 .

 Overton, Emmett, and Caruso secured the crime scene and found
 fired cartridge casings in that area. They also attempted to find
 eyewitnesses, but no one was willing to cooperate.

 While Officers Overton, Emmett, and Caruso tended to the
 gunshot victim, controlled the crowd, and preserved the crime
 scene, Officer Mathis ran after the red truck, which was travelling
 westbound on Norris Street toward 25th Street. When Officer
 Mathis lost sight of the truck at 25th and Norris Streets, he alerted

 - 2 -
J -S02015-18

 other officers of a red Ford truck with license plate YYD2101 and
 asked police travelling in that area to stop the truck. Officer
 Shanna Moore was travelling in the area of 29th and Diamond
 Streets when she heard Officer Mathis' description of the truck
 over police radio. Minutes later, she saw a red truck matching this
 description on the 2500 block of Page Street, a small street
 between Norris and Diamond Streets, and signaled for the truck
 to stop. It did not stop, and Officer Moore gave chase. During
 this pursuit, the truck disregarded stop signs and traffic signals
 and drove in the wrong direction on many one-way streets.

 The truck slowed down on the 1600 block of Natrona Street,
 where Officer Moore observed the passenger exiting the vehicle.
 Officer Moore informed other officers of the passenger's exit over
 police radio and described the passenger as a "black male, light-
 complected [sic], approximately 6'3", 300 pounds, [wearing] tan
 pants, white shirt." She could not tell which direction the
 passenger fled because he was still standing on the street when
 she continued to follow the truck. As she continued to pursue the
 truck, Officer Moore continued to inform the other responding
 officers of her location and progress over police radio. The truck
 essentially drove in a circle and returned to the 1700 block of
 Natrona Street, about one block from where the passenger exited
 the truck. When the truck stopped, the driver exited on the 1700
 block of Natrona Street. The truck crashed into a parked vehicle
 and was later held by other responding officers for investigation.
 [The driver, co-defendant King, was ultimately caught and
 arrested after a chase.]

 After co-defendant King's arrest, Officer Moore met Officer
 Ivan Rosado who helped search for the passenger in the
 surrounding area. Based on information Officer Rosado received
 from construction workers near Natrona and Turner Streets, he
 and Officer Moore walked south on Natrona Street toward Turner
 Street. Within seconds, Officer Moore observed the passenger
 standing on the corner using a cell phone. She pointed toward
 the intersection of Natrona and Turner Streets and yelled, "There
 he is . . That's him, that's him." Officers Moore and Rosado
 . .

 then chased the man down the 3200 block of Turner Street, but
 they lost sight of him.

 -3
J -S02015-18

 Dawn Cheatham, a resident on the 3200 block of Turner
 Street, had earlier observed a police vehicle following the red
 truck as it drove in the wrong direction on Natrona Street, going
 toward Oxford Street. About five to ten minutes later, Ms.
 Cheatham saw an unknown man walking back and forth on her
 block. Appearing to be fidgety, the man approached and asked
 her if he could use her bathroom. As she told him no, police were
 coming around the corner. The man, later identified as
 [Appellant], walked past her and entered her home, where her
 sixty -year -old mother and eleven -year -old son were found.

 As Officer Rosado turned the corner, he saw Ms. Cheatham
 and two other women waving and yelling at him. When he and
 Officer Moore reached 3219 Turner Street, Ms. Cheatham told
 them that an unknown large black male had run into her home
 without permission. As they tried to open the locked door, Officer
 Moore heard screaming from inside the home. Officer Rosado
 kicked open Ms. Cheatham's door to gain entry, and found Ms.
 Cheatham's mother and son inside the house. Ms. Cheatham's
 mother appeared upset, and her son was crying and asking for
 help. Officers Moore and Rosado found [Appellant] standing inside
 the back bedroom.

 They arrested [Appellant] and took him outside. For safety
 reasons, Officer Rosado searched the immediate area where
 [Appellant] stood in the back bedroom. No gun was recovered
 from that room or from [Appellant's] person. [Appellant's] cell
 phone was confiscated by Officer Moore. Due to [Appellant's]
 large size, he was transported in a police wagon.

 At approximately 5:20 p.m., Officer Christopher Reed
 arrived and processed the shooting scene, collecting and
 photographing evidence. . .

 Officer Reed recovered nine fired cartridge casings and four
 bullet fragments from the scene. . [He also recovered a wool
 . .

 hat with eye holes cut into it near where Mr. Smith was shot.]

 After surveying the crime scene, Detective Domenic went to
 the 1700 block of Natrona Street, where the truck crashed.
 Detective Domenic examined the truck's interior and exterior.
 There was no indication that the truck had been shot at because

 - 4 -
J -S02015-18

 it had no bullet holes. Detective Domenic lifted two fingerprints
 from the exterior passenger door and three fingerprints from the
 interior passenger door of the red Ford F-250 pickup truck. On
 September 11, 2009, he submitted five fingerprint cards to Patrick
 Reytik, a latent fingerprint examiner from the Records and
 Identification Unit, and requested a comparison of those
 fingerprints to those obtained from co-defendant King and
 [Appellant]. At trial, Mr. Reytik concluded with a reasonable
 degree of scientific certainty that one fingerprint from the interior
 passenger door was co-defendant King's right thumb. The
 remaining four fingerprints were unidentifiable due to smudges
 and partial fingerprints.

 Detective Domenic also recovered two photographs from
 the truck, one of which was printed on July 22, 2009 and depicted
 the victim, Gregory Smith, with his two brothers. . On October
 . .

 12, 2009, that photograph was submitted to Mr. Reytik for
 comparison and identification. Two fingerprints on the back right
 side of the photograph were identified as co-defendant King's left
 index finger and left thumb. One fingerprint toward the back
 center of the photograph was identified as co-defendant King's left
 thumb. Mr. Reytik was unable to identify any other fingerprints
 on the photograph due to smudges and partial fingerprints.

PCRA Court Opinion, 5/3/17, at 2-7 (citations omitted).

 Upon this evidence, Appellant was convicted of and sentenced for, inter

alia, the attempted murder of Gregory Smith. Our Supreme Court denied his

petition for allowance of appeal after this Court affirmed in part and vacated

in part his judgment of sentence. Commonwealth v. Stamps, 47 A.3d 1244
(Pa.Super. 2012) (unpublished memorandum) (vacating conviction for fleeing

and separate sentence for aggravated assault; affirming in all other respects),

appeal denied, 49 A.3d 443 (Pa. 2012).

 -5
J -S02015-18

 Appellant timely filed a pro se PCRA petition, counsel was appointed, an

amended petition was filed, new counsel entered an appearance, and a

supplemental amended petition was filed. The PCRA court thereafter issued

notice of its intent to dismiss Appellant's petition without a hearing based upon

lack of merit. Appellant filed a response highlighting, inter a/ia, the issues he

argues in this appeal. The PCRA court dismissed Appellant's petition by order

of March 4, 2016. Appellant filed a timely notice of appeal, and both Appellant

and the trial court complied with Pa.R.A.P. 1925.

 Appellant presents this Court with the following claims of error.

 [1.] Trial counsel performed deficiently for not seeking pre-trial
 DNA testing on the wool cap and for not consulting with
 [Appellant] regarding the possibility of conducting pre-trial DNA
 testing on the wool cap. The PCRA erred in holding otherwise and
 in not granting DNA testing and the funds to pursue such testing
 so [Appellant] could develop additional facts to prove prejudice[.]

 [2.] Trial counsel performed deficiently for not retaining an
 independent fingerprint examiner to examine the four allegedly
 unidentified fingerprints lifted from the interior and exterior of the
 red truck's passenger side door and for not consulting with
 [Appellant] regarding the possibility of retaining a fingerprint
 examiner to examine the four allegedly unidentified fingerprints.
 The PCRA erred in holding otherwise and in not granting access to
 the fingerprints and the funds to retain an independent fingerprint
 examiner so [Appellant] could develop additional facts to prove
 prejudice[.]

Appellant's brief at 5.

 Our standard of review is whether the PCRA court's decision is free of

legal error and supported by the record. Commonwealth v. Rivera -
Figueroa, 174 A.3d 674, 677 (Pa.Super. 2017).

 -6
J -S02015-18

 As Appellant contends his trial counsel rendered constitutionally -

deficient representation, the following principles apply.

 It is well -established that counsel is presumed to have provided
 effective representation unless the PCRA petitioner pleads and
 proves all of the following: (1) the underlying legal claim is of
 arguable merit; (2) counsel's action or inaction lacked any
 objectively reasonable basis designed to effectuate his client's
 interest; and (3) prejudice, to the effect that there was a
 reasonable probability of a different outcome if not for counsel's
 error. The PCRA court may deny an ineffectiveness claim if the
 petitioner's evidence fails to meet a single one of these prongs.
 Because courts must presume that counsel was effective, it is the
 petitioner's burden to prove otherwise.

Commonwealth v. Johnson, 179 A.3d 1105, 1114 (Pa.Super. 2018)
(citations and quotation marks omitted).

 We first consider whether the PCRA court erred in concluding that

Appellant is entitled to no relief on his claim that trial counsel was ineffective

in failing to obtain DNA testing of the wool cap that was found at the crime

scene. Appellant contends that the claim has arguable merit because the

identity of the passenger/second gunman was at issue and that counsel lacked

a reasonable basis for foregoing testing or consulting with Appellant about

whether to test. Appellant's brief at 24-32. Further, Appellant maintains that

he requires DNA testing of the cap in order to prove that he was prejudiced

by counsel's deficient performance. Id. at 35-36.
 Appellant's arguments are largely based upon our Supreme Court's

decision in Commonwealth v. Williams, 899 A.2d 1060 (Pa. 2006).

However, an examination of the differences between the facts of that case

 -7
J -S02015-18

and those herein reveals that the PCRA court properly determined that

Appellant's claim lacks merit.

 In Williams, the victim was raped four times in her apartment before

her attacker attempted to kill her by shooting her in the head and slashing her

neck. However, the victim survived because the gun would not fire and the

neck wounds were not fatal. The victim identified the defendant Williams,

whom she had known for nearly a year as the boyfriend of one of her friends,

as her attacker. She identified Williams to the bystander who found her

running down the street bleeding immediately following the attack; she

identified him to police; and she "remained steadfast in her identification of

[Williams] throughout the trial." Id. at 1062.

 The Commonwealth offered no physical evidence implicating Williams.

Williams testified that he was elsewhere at the time in question. He also

offered the alibi testimony of his girlfriend, as well as evidence that the victim

had been threatened by her boyfriend with a razor on a prior occasion.

Nonetheless, the jury convicted Williams of, inter alia, rape and attempted

homicide. Id.
 Williams filed a PCRA petition claiming that his trial counsel was

ineffective "for failing to request DNA testing to show [Williams's] blood did

not match the semen specimens from the vaginal swab, the victim's clothing,

and the victim's bedding." Id. The PCRA court dismissed the petition without

a hearing, determining that it was a waste of money to conduct a test to

 -8
J -S02015-18

"further prove the identity of" Williams as the perpetrator. This Court affirmed

on the basis that the victim's identification of Williams was "both credible and

unchallenged." Id. at 1063. Our Supreme Court rejected this analysis, noting

that Williams did indeed challenge identification at trial by offering an alibi

defense. Further, because identification was an issue, it found arguable merit

to the claim that counsel was ineffective in failing "to pursue evidence which

may have challenged the victim's identification." Id. at 1064. Acknowledging

that Williams would be unable to prove that he was prejudiced by counsel's

ineffectiveness without obtaining DNA testing, the Court held that the testing

should take place if Williams was able to prove that counsel lacked a

reasonable basis for choosing not to test the DNA evidence. Id. at 1065-66.
 In addressing the question of reasonable basis, the Court offered the

following discussion of "the dilemma that the two-edged sword of definitive

testing poses for trial counsel." Id. at 1064.

 It is easy to say that failing to pursue exculpatory evidence
 isineffectiveness, but this presumes the evidence will indeed be
 exculpatory. If counsel were sure the accused's DNA would not
 be revealed in any relevant samples from the victim or scene,
 certainly testing would give exculpatory results and should be
 sought. However, the client's mere claim of innocence or alibi
 does not always settle the question; effectiveness of counsel is
 not dependent on accepting the candor of the client. Testing that
 shows the DNA matches suddenly makes a conviction -one that
 might have been avoided or less than certain -a sure thing.

 That is, subjecting a client to DNA testing is very likely to
 settle whether there will be a conviction or not. It can demolish
 the prosecution's case, but it can cast it in concrete as well. It
 can eliminate the potential of a "not guilty" verdict based on an
 alibi, or on reasonable doubt, and the less compelling the

 - 9 -
J -S02015-18

 Commonwealth's case, the less compelling is the desire for pre-
 trial DNA testing. Not seeking testing that has the potential to
 convict a client may be a very reasonable strategy; strategy is not
 measured through hindsight against alternatives not pursued, so
 long as trial counsel had a reasonable basis for the decision made.

 Appellant did not claim any affirmative defense (e.g.,
 consent), and there is no record of more than one semen donor;
 appellant argues the absence of these factors and his self-
 proclaimed innocence show trial counsel did not have a reasonable
 basis for not seeking DNA testing. However, counsel knew the
 victim immediately and repeatedly identified appellant as her
 attacker. The victim had known appellant eight or nine months
 prior to the incident, seeing him nearly every day during that
 period. The possibility she was correct in her identification was
 significant, yet the absence of physical corroboration gave the
 defense the chance for a not guilty verdict. Was it ineffectiveness
 to forgo the risk of creating that corroboration?

Id. at 1064-65 (citation omitted). The Court determined that the answer to

that question could not "readily be answered from the record," and thus

remanded for an evidentiary hearing to address "the nature of [Williams's]

alleged request for DNA testing" as well as "counsel's response to that

request." Id. at 1065.

 Based upon the fact that the only semen obtained from the victim was

that of her attacker, Williams presented the rare exception to the general

rule that "an absence of evidence is not evidence of absence."

Commonwealth v. Heilman, 867 A.2d 542, 547 (Pa.Super. 2005). In that
case, evidence that the semen belonged to anyone other than Williams would

establish that he, in fact, was not the attacker.

 The instant case falls within the general rule, not the exception. There

was no suggestion by anyone at trial that the wool cap in question was worn

 - 10 -
J -S02015-18

by the passenger in the red truck. Accordingly, finding the DNA of someone

other than Appellant on that item would do absolutely nothing to challenge

the identification of Appellant as that passenger. Counsel here was not

presented with the dilemma faced by Williams's trial attorney, as a "favorable"

result to DNA testing would not "demolish the prosecution's case" or in any

way exculpate Appellant. On the other hand, an unfavorable result would

provide physical corroboration to what was a far less iron -clad identification

than that at issue in Williams.

 Contrasting the circumstances of Williams with the underlying facts of

the case sub judice, we conclude that Appellant has failed to allege facts that

would establish any of the three prongs of the ineffectiveness test. He has

not shown that the issue has arguable merit because, since the hat was in no

way associated with identification of the passenger, DNA testing would do

nothing to challenge that identification. Similarly, even assuming that testing,

if done, would reveal that Appellant's DNA was not on the hat and someone

else's was, Appellant cannot show that he was prejudiced by counsel's failure

to obtain those results because they cast no additional doubt on his

identification. Finally, unlike in Williams, counsel's basis for failing to obtain

the test in this case is readily apparent from the record. Counsel used the

Commonwealth's failure to test the hat to Appellant's benefit, arguing that the

lead detective on the case ignored "independent, objective, neutral evidence"

in favor of their premature conclusion that they had their man once they
J -S02015-18

arrested Appellant. Appellant's brief at 28 (citing N.T. Trial, 4/26/10, at 212-

13). Given that there was nothing to gain and everything to lose by actually

testing the hat, the record shows that counsel had a reasonable basis for

opting not to do so and instead using the absence of testing to attempt to sow

another seed of doubt. Therefore, Appellant has not met his burden of

convincing this Court that the PCRA erred in dismissing his DNA claim.

 Appellant's second claim, that counsel was ineffective in not obtaining a

fingerprint expert, fails for similar reasons. At trial, the Commonwealth's

fingerprint expert discussed five fingerprints taken from the passenger door

of the truck. One matched co-defendant King, and the others were

unidentifiable. Hence, because the fingerprint evidence played no part in the

Commonwealth's case against Appellant, testimony that the unidentified

prints belonged to someone other than Appellant would not undermine the

prosecution's case.

 In contrast to Williams, where only the semen of the attacker was

present and the absence of Williams's semen would show his innocence, the

absence of fingerprint evidence against Appellant in this case would not prove

that Appellant was not the second shooter. Heilman, supra at 546 (holding

forensic testing to show the presence of another man's semen was not

warranted where "the victim was a prostitute and the semen could have been

deposited by anyone"). Hence, the claim lacks arguable merit.

 - 12 -
J -S02015-18

 Along the same lines, Appellant cannot establish prejudice because even

if he obtained an expert to testify that the recovered prints did not belong to

Appellant, that testimony would have no negative impact on the

Commonwealth's identification evidence. Moreover, we agree with the PCRA

court that, since the Commonwealth's fingerprint expert did not inculpate

Appellant and "an additional analysis on the fingerprints ran the risk of

inculpating" him, it is apparent from the record that counsel had a reasonable

basis for not seeking an expert of his own. PCRA Court Opinion, 5/3/17, at

11. Therefore, Appellant has failed to allege facts that would establish any of

the prongs of counsel's ineffectiveness.

 Appellant has not persuaded us that the PCRA court erred in determining

without a hearing that his DNA and fingerprint -expert claims lacked merit.

Accordingly, we affirm the order dismissing his petition.

 Order affirmed.

Judgment Entered.

J seph D. Seletyn,
Prothonotary

Date: 6/22/18

 - 13 -